**PHILADELPHIA NEWSPAPERS, INC.**

v.

**DEPARTMENT OF HOUSING AND UR-
BAN DEVELOPMENT OF the
UNITED STATES et al.**

Civ. A. No. 71–2798.

United States District Court,
E. D. Pennsylvania.

March 9, 1972.

David Marion and Stephen Haberfeld, Philadelphia, Pa., Harold E. Kohn, P. A., Philadelphia, Pa., on the brief, for plaintiff.

Malcolm Lazin, Philadelphia, Pa., Louis C. Bechtle, U. S. Atty., Philadelphia, Pa., on the brief, for defendants.

## OPINION AND ORDER

JOHN W. LORD, Jr., District Judge.

This is a proceeding under the Freedom of Information Act, 5 U.S.C.A. § 552 et seq. (hereinafter the Act). Plaintiff [1] seeks to compel the defendants to provide it with the names of certain appraisers who have, allegedly, appraised, far in excess of their value, dilapidated homes. As a result of these appraisals, furnished to the Federal Housing Authority (hereinafter sometimes FHA), low income buyers, particularly vulnerable to misinformation in economic matters, have been victimized into the purchase of these homes. For reasons set forth within the opinion, we reject the government's claims that these records are immune from disclosure as part of intra-agency memoranda and/or as part of investigatory files, and grant the plaintiff's request.

Since August of 1971, the Inquirer has published a series of articles based on investigations by staff reporters. These articles have detailed the alleged over-evaluations mentioned earlier. The paper's Executive Editor, John McMullan, formally demanded, on August 30, 1971, that, pursuant to the Act, the paper be supplied with the names and addresses of staff appraisers employed by the FHA since January 1, 1969. This information was supplied, although a request for the names and addresses of fee appraisers [2] who had evaluated certain properties for FHA insurance was denied. The government refused the request because, it alleged, the information was "exempt from disclosure [under the Act] as intra-agency memoranda and as matter that [was] part of investigatory files." [3]

On September 30, 1971, plaintiff filed with Secretary Romney a petition for review of the regional administrator's denial; a review which was denied on November 11, 1971.

### I

## THE INTRA–AGENCY MEMORANDA EXEMPTION

The history of the Freedom of Information Act establishes that its primary purpose was to increase the access of the public to information contained in government records. See, e. g., American Mail Line, Ltd. v. Gulick, 133 U.S. App.D.C. 382, 411 F.2d 696 (1969). Prior to enactment of this legislation, the prevailing statute was the Administrative Procedure Act, which was characterized as containing "loopholes which allow[ed] agencies to deny legitimate information to the public." [4] The present act, which grew out of the hearings which so characterized the old legislation, was obviously intended therefore not only to plug those loopholes, but also to restrict severely any exemption to the Act.

The present Act provides [5] that each agency of the government, on request for identifiable records, "shall

---

1. *The Philadelphia Inquirer* has made the requests of the Court. Plaintiff also owns *The Daily News*, which is not a party to this action.

2. A fee appraiser is certified annually by the Department of Housing and Urban Development, and is paid a fee for each property appraised, rather than an annual salary, as is a staff appraiser.

3. A federal grand jury has been empaneled to inquire into certain alleged irregularities in the housing field, including overvalued appraisals.

4. S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965); *see*, H.R.Rep.No.1497, 89th Cong., 2d Sess. 5 (1966).

5. At § 552(a) (3).

make the records promptly available to any person." It further provides that the determination of the district court shall be *de novo*, with the burden on the agency to justify the refusal to disclose. In addition, regulations promulgated *by* the Department of Housing and Urban Development (hereinafter sometimes HUD), provide that the agency must, in addition to its burden under the Act, demonstrate "a need in the public interest to withhold the information requested." 24 C.F.R. § 15.21.[6] This, we find, it has failed to do.

■■ The claimed exemption under § 552(b) (5) is incorrect. This applies only to material subject to the executive privilege, i. e., internally created papers designed to assist in the deliberative or policy-making process of government. Where the material sought is essentially factual, and we believe that names and addresses are,[7] it falls outside the ambit of protection given by the exemption.[8]

■ We state most emphatically at this juncture, because it will arise again and again as we distinguish government cases and arguments, that the names and addresses of appraisers are *not* part of the raw input that contributes to decision making. We also state most emphatically that we reject entirely the notion that the figures they put on houses for insurance purposes are merely that: recommended evaluations of buildings. They are not, and in our eyes cannot rise to be, part of the decision making process of any arm of the government. We hold today that the gap between suggested prices and policy recommendations within the protection of executive privilege is unbridgeable.

The government bases its claim that the exemption is applicable here on two cases, neither of which is controlling. In Ackerly v. Ley, 137 U.S.App.D.C. 133, 420 F.2d 1336 (1969), the appellate court was asked to review a district court determination of the relevance of the intra-agency exemption. The circuit found that it did not have before it a sufficient record on which to decide whether or not the exemption applied, and remanded the action to the trial court. The defendants' reliance here is on a footnote [9] of the appellate decision which cites the congressional policy behind the exemption, a policy which we have already reviewed and found not to be relevant to appraisers.[10] Freeman v. Seligson, 132 U.S.App.D.C. 56, 405 F.2d 1326 (1968), relied upon almost the same passage from the legislative history of the act,[11] and correctly held that truly investigatory documents, pertaining to evaluations and policy recommendations, were exempt. Again, that is not the case before us.[12]

6. Regulations reasonably adopted to the administration of a congressional act, and not inconsistent with any statute, have the "force and effect of law." G. L. Christian & Associates v. United States, 320 F.2d 345, 350, 160 Ct.Cl. 58 (1963).

7. Courts having jurisdiction to consider problems of executive privilege participate in determining the scope of the privilege. United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). Our jurisdiction to consider the original question arises from 5 U.S.C.A. § 552 (a) (3).

8. An excellent, detailed analysis of many of the exemptions may be found in Bristol-Myers Co. v. F.T.C., 138 U.S.App.D.C. 22, 424 F.2d 935 (1970), and cases there cited. We feel that to review each exemp-

tion at this time would unnecessarily prolong this opinion.

9. Note 7, 420 F.2d at 1341.

10. *Ackerly* dealt with a medical evaluation of a potentially harmful substance, with a view toward removing it from public sale. This would be clearly policy-oriented, and we repeat that the mere suggestion of a price would not.

11. Note 70, 405 F.2d at 1339.

12. The government's secondary sources are also unpersuasive. Miller v. Smith, 292 F.Supp. 55 (S.D.N.Y.1968), concerned a Coast Guard Review Board's recommendation that a license be suspended; and International Paper Co. v. Federal Power Commission, 438 F.2d 1349 (2nd Cir. 1971), dealt with policy recommendations

## II

### THE INVESTIGATORY FILES EXEMPTION

■ The government next claims that these names and addresses are protected as part of investigatory files.[13] This argument is roughly divided into three sections: that the material sought would not be discoverable in any case; that the information sought is part of grand jury documents and cannot be disclosed; and that *if it were to be disclosed, and if it were to proceed from investigation to trial*, the people named *might* be subject to prejudicial pre-trial publicity.

■ The first claim is the most quickly defeated. One purpose of Congress in creating this exemption was to limit those charged with violations of federal statutes to the discovery available to persons charged with violations of federal criminal law. Barceloneta Shoe Corp. v. Compton, 271 F.Supp. 591 (D. P.R.1967). The exemption prevents a litigant from using the statute to achieve indirectly "an earlier or greater access to investigatory files than he would have directly." [14] However, an agency cannot, "consistent with the broad disclosure mandate of the Act, protect all its files with the label 'investigatory' and a suggestion that enforcement proceedings may be launched at some unspecified future date." [15]

With regard to the second contention, investigatory files, we feel that the defendants have fallen into a fallacious line of reasoning, one which was predicted before the Act created the current flurry of litigation.

The Act is faulty in its use of the unsatisfactory term "files." Much of the contents of investigatory files compiled for purposes that may include law enforcement should not be exempt from required disclosure.[16]

In Freeman v. Seligson, *supra,* 405 F. 2d at 1340, cited again by the government in support of this argument, the court reviewed some of the documents requested, and found that they, as part of a preparation for prosecution, were exempt from discovery. The material here had no privileged character before its inclusion in grand jury investigative binders. Courts have on numerous occasions construed analogous questions, and in each instance found that where the material requested was not inherently privileged, the right to secret it was not available. In Small Business Administration v. Barron, 240 F.Supp. 434 (W. D.S.C.1965), in which personal financial records and stock certificates were sought, the court declared

It is, of course, fundamental to proper assertion of the privilege that the material sought was itself in the original instance privileged material.[17] *Id.* at 448.

---

used in the deliberative process of the Federal Power Commission. Machin v. Zuckert, 114 U.S.App.D.C. 335, 316 F.2d 336 (1963) and Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 280 F.2d 654 (1960) are similarly distinguishable. The government concludes this section of its case by stating that we should abstain because this case is too intimately connected with that of Davis v. Romney, 55 F.R.D. 337, of the Eastern District of Pennsylvania. Judge Davis, of this Court, who is hearing the Davis v. Romney litigation, sat with us at a hearing attended by counsel in the instant case and agreed with us that the cases were distinguishable.

13. 5 U.S.C.A. § 552(b) (7).

14. H.R.Rep.No.1497, 89th Cong. 2d Sess. 5, note 5 at 11.

15. See, Bristol-Myers Co. v. F.T.C., *supra* at note 8.

16. Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 800.

17. Accord, United States v. Silverman, 430 F.2d 106 (2nd Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971) (minutes of union local); American Cyanamid Co. v. Hercules Powder Co., 211 F.Supp. 85 (D.Del.1962) (patents). Both of these cases involved materials claimed to be privileged because of transmission within the attorney-client privilege; however, both are applicable as standing for the proposition that materials not in themselves privileged will not be exempted from disclosure.

The government's arguments for retention of the documents is buttressed only by cases involving materials *in themselves* deserving of some form of confidentiality *aside* from their inclusion with other, exempted materials.

Cowles Communications, Inc. v. Department of Justice, 325 F.Supp. 726 (N.D.Cal.1971) is typical of the defendants' authorities. The court refused to permit the government to simply "file an affidavit [that the investigatory exemption applied] . . . and by so doing foreclose any other determination of the fact." *Id.* at 727. An *in camera* determination of the file's confidentiality was then ordered by the trial judge. If anything, we think that the government has, with *Cowles*, filed a persuasive case on behalf of the plaintiff.[18]

We review the other principal cases of the government only for the sake of thoroughness, and not because we feel they carry any greater weight toward permitting non-disclosure. United States v. Stein, 18 F.R.D. 17 (S.D.N.Y. 1955), was a Smith Act prosecution in which the court refused to reveal documentary evidence presented to a grand jury. We are concerned with names and addresses here, not the type of "books, magazines, newspapers, pamphlets, circulars or directive" which the government meant to use in the Stein trial.[19] Application of State of California, 195 F.Supp. 37 (E.D.Pa.1961), was a request to review grand jury subpoenas, in order to prepare private treble-damage actions under the anti-trust laws.

The defendants have relied upon many cases which have held the grand jury's deliberations to be inviolate, and the minutes of their proceedings to be immune from discovery. That is not the situation presently before us. We are asked to release to plaintiffs only the names and addresses of the appraisers: information which was in no way protected *before* it was inserted into file binders presently being reviewed by the grand jury. The intent of Congress in passing the Act was to permit the public to know. What the government would have us do here is preclude the public from knowing the names and addresses of fee appraisers because they have been included, *after the fact,* in binders now before a grand jury. No request has been made to inspect minutes of the grand jury's proceedings; no attempt has been made to interview members of the inquiring panel; no questions have been submitted to witnesses now before the grand jury. The *only* request now before us, we repeat, is permission to look at names and addresses in no way privileged in themselves, and not now exempted by the act of the government in putting them into these binders.

Those courts which have reviewed the question of confidentiality have always required that the documents be deserving of some form of protection in themselves, and not because of their inclusion with other, arguably immune, documents or files. See, United States v. Silverman, *supra,* and American Cyanamid Co. v. Hercules Powder Co., *supra* at note 17.

We turn finally to the question of possible prejudicial pre-trial publicity. Secretary Romney wrote to the Inquirer that he believed the publication of the names and addresses would be a disservice to the public. On the contrary, we believe that constitutional guarantees, such as a free press,

---

18. Similarly, its other cases are inapposite. Benson v. United States, 309 F.Supp. 1144 (D.Neb.1970) concerned statements made to an administrative review board of the Air Force—see, *e. g.,* Miller v. Smith, *supra* at n. 12—and therefore more deserving within themselves of confidentiality than mere names and addresses. Clement Brothers Co. v. N.L.R.B., 282 F.Supp. 540 (N.D.Ga.1968) held only that other than criminal files were capable of protection from public review, in that case, files of the National Labor Relations Board. This is an unexceptionable holding, but not contrary to anything that we say today.

19. The government was subsequently ordered to reveal the documents.

[A]re not for the benefit of the press so much as for the benefit of all of us. A broadly defined freedom of the press assures the maintenance of our political system and an open society.[20]

The thrust of the government's case, taking its philosophical direction from the correspondence of Secretary Romney and the *Inquirer,* is that constitutional guarantees with respect to the press are applicable only in cases of prior restraint. While we agree that this is not the *classic* case of attempted prior restraint, we find that even if it were, the cases are not limited in their remedial effect to them.

> [L]iberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship.[21]

We are confronted here by alleged improprieties by public officials, or private citizens paid with public funds, and if these misdeeds were perpetrated, the public has a right to know about them. While this is not, as we have noted, the classic case of prior restraint, it approaches it. "Any system of prior restraints of expression comes to [a court] bearing a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S. Ct. 631, 639, 9 L.Ed.2d 584 (1963). To prevent publication then, the defendants carry "a heavy burden of showing justification for the imposition of such a restraint." Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971). The presumption has not been overcome; the burden has not been carried.

The fear of the government that a sensationalized atmosphere would be created so prejudicing the climate of a potential trial that a fair proceeding would be impossible is not a reasonable one.

The basis for such an allegation is, of course, the infamous Sheppard case, in which more than a decade elapsed before the arena-like atmosphere of Dr. Sam Sheppard's first trial was cleared away by the Supreme Court in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). We see no possibility of repetition in this matter. It seems unlikely to us that the paper would publish the names and addresses of men who appraised buildings in such an inflammatory style that any future proceedings—if indeed, any are ever brought—would be tainted with the kind of sensationalism that surrounded the first Sheppard murder trial.

New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) teaches, *inter alia,* that the mere labeling of a proceeding as one best kept remote from the public eye is not sufficient, particularly where, as here, the danger is remote. As Justice Black stated in his concurring opinion

> [F]or the first time in the 182 years . . ., the federal courts are asked to hold that the First Amendment does not mean what it says, but rather means that the Government can halt the publication of current news of vital importance to the people of this country.[22]

We do not, of course, feel that the alleged improprieties here rise to the level of national interest of the Pentagon Papers, but this investigation is into a program which may have victimized homebuyers in the Philadelphia area and thwarted the objectives of a government program involving enormous amounts of public funds. Surely the public has a right to know.

20. Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967).

21. Near v. Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931).

22. *Id.* at 715, 91 S.Ct. at 2142.

As stated by Chief Justice Hughes in Near v. Minnesota ex rel. Olson, 283 U. S. 697, 719–720, 51 S.Ct. 625, 632

[T]he administration of government has become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and property by criminal alliances and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities. The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct.

■ It is not original with us to state that the First Amendment was adopted against the widespread use of common law remedies for seditious libel to punish those who would embarrass those in positions of power. See, e. g., T. Emerson, The System of Freedom of Expression (1970); cf. Warren, The Making of the Constitution (2d Ed. 1937).

Here, as in the *New York Times* case, the government's claims are that the material sought "could" or "might" or "may" prejudice those about whom it speaks. And here, too, we reject that as entirely unacceptable. *See,* concurring opinion of Justice Brennan, 403 U.S. at 725–726, 91 S.Ct. 2140.

We have reviewed at too great a length the contentions of the government, and find in none of them justification for the withholding of the material sought, and therefore will enter the following order:

And now, to wit, this 9th day of March, A.D.1972, it is ordered that plaintiff's motion for summary judgment be and the same is hereby granted.

And it is so ordered.

## ORDER

On March 9, 1972 we entered an opinion and order granting plaintiff's motion for summary judgment. The principal question decided in the opinion was whether or not the names of fee and staff appraisers, presently included in file binders before a grand jury, were immune from release under the exceptions to the Freedom of Information Act, 5 U.S.C.A. § 552 et seq. (Section 552(b) (7) of the Act exempts investigatory files.)

Our opinion (at p. 1180) specifically, and emphatically, rejected the government's position. We discussed each of their cases, and the arguments implicit within them, and found that these materials had no privileged character within themselves, and could not, therefore, be immune because of their mere inclusion with binders now before a grand jury.

The United States Attorney, counsel for defendants in this matter, has requested that we frame an order compelling release of the names and addresses within the language of Rule 6(e), Fed. R.Crim.P. This we refuse to do. The language of that rule applies only to disclosure of matters occurring before a grand jury. To rule that disclosure at this time comes within Rule 6(e) would be to negate the very thrust of our decision: that the material is not immune from discovery as part of investigatory files, and to continue to retreat into the language of Rule 6(e) would imply that it is.

The names and addresses sought are those of the appraisers of the properties listed in plaintiff's affidavit and specimen order. The United States Attorney, if he is not in receipt of the property list may obtain it from the Clerk of the United States District Court, and will be ordered to do so without further delay.

And now, to wit, this 16th day of March, A.D.1972, it is ordered that the United States Attorney make available to plaintiff the names and addresses of

appraisers of properties listed on plaintiff's application for production.

It is further ordered that this be done immediately and without further delay of any kind.

And it is so ordered.