**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**LOS ALAMOS CONSTRUCTORS, INC., Defendant.**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**Orlando S. Lopez and Jose G. Ortiz, Plaintiffs in Intervention, as to Defendant, Zia Company,**

v.

**The ZIA COMPANY, Defendant,**

**Civ. A. Nos. 74-173, 74-174.**

United States District Court,
D. New Mexico.

Oct. 9, 1974.

**1374**

William A. Carey, Gen. Counsel, William L. Robinson, Associate Gen. Counsel, Washington, D. C., Peter Sanchez-Navarro, Jr., Acting Reg. Counsel, Samuel Dashiel, Deputy Regional Counsel, William C. Oldaker, Asst. Reg. Atty., Sylvan R. Roybal, Trial Atty., Denver, Colo., Mary Dunlap, Dist. Counsel, Albuquerque, N. M., for plaintiff.

Joan Friedland and Morton S. Simon, Santa Fe, N. M., for plaintiffs in intervention.

Rodey, Dickason, Sloan, Akin & Robb by Robert M. St. John, Albuquerque, N. M., (L. J. Maveety, Los Alamos, N. M., of counsel), for defendants.

## MEMORANDUM OPINION

WINNER, District Judge, sitting by Designation.

These consolidated cases are before the Court on discovery problems. The zeal with which plaintiff resists routine discovery necessitates a much longer opinion than discovery squabbles deserve.[1] Moreover, the problem is a recurring one, and I want to add to the many cases on the subject my word of protest against the view of the executive branch of the government that it can govern in secret. That thinking pervades the entire executive branch, and there is little wonder that we face a crisis in public confidence in government officials and employees.

Here, plaintiff filed a skeleton complaint which pleaded few facts and which alleged by way of legal conclusion that defendant, Zia, was guilty of discriminatory practices in its employment practices. A motion to dismiss and a motion for a more definite statement were denied on the theory that the complaint is just barely sufficient under notice pleading concepts. However, at pretrial conference, plaintiff was ordered to set forth in a pretrial order a fair summary of the facts on which it relies. To date, plaintiff has ignored the Court's order, and defendant is still defending against nothing but a phantom legal conclusion sketched out in the complaint. As a last resort, defendant is now trying to find out through interrogatories what it is accused of, but plaintiff's answers to many of the interrogatories have frustrated defendant's efforts to make reasonable preparations for trial. Twenty-one interrogatories were served, and the answers to less than half of them were acceptable to defendant. Answers to nine of the interrogatories are declined in part because of the so-called "informer's privilege," and, when asked to name its witnesses, plaintiff's ipse dixit is that it will name its witnesses "prior to trial."

Nothing could be accomplished by listing all of the controverted answers to interrogatories [although each will be ruled upon by order separate from this opinion] because plaintiff aims its brief in support of its recalcitrance at the claim of "informer's privilege" or "ex-

---

1. Plaintiff's determination to conceal the facts on which its case is based is equaled only by its determination to pry into a prospective opponent's files in investigative proceedings.

See, Equal Employment Opportunity Commission v. Joslin Dry Goods Co. (1973) 10 Cir. 483 F.2d 178.

ecutive privilege."[2] Typical of the answers objected to by defendant is plaintiff's answer to Interrogatory No. 5. That interrogatory asked for the names of persons having knowledge of the facts of the case. Some names were supplied, but plaintiff refused to disclose the names "of those persons whose identities must remain confidential, i. e., informers." The answer to Interrogatory No. 6 attempts to claim the "informer privilege" and the "intra-agency memoranda" privilege, and it is this last claim which makes necessary discussion of the Freedom of Information Act, 5 U.S.C. § 552, as well as discussion of the history leading up to the enactment of that statute.

■ My predilections as to claims of governmental privilege fully appear in 28 F.R.D. 97, 107, a paper presented by me, speaking as a lawyer, to the Tenth Circuit Judicial Conference in 1960. The intervening fourteen years have added judicial and Congressional support to the views I then expressed, and it is now generally recognized that bureaucrats cannot hide behind a privilege claim unless national security or an overwhelming public interest demands that the agency be permitted to operate behind locked doors. Those unfortunate enough to be forced into litigation with the government still face agency insistence on trial by ambush, although, as we will see presently, Congress and the courts agree that a recognition of governmental privilege is the rare exception, while full disclosure is the almost universal rule. When the government or one of its agencies comes into court [with very few exceptions], it is to be treated in exactly the same way as any other litigant. Appointment to office does not confer upon a bureaucrat the right to decide the rules of the game applicable to his crusades or his lawsuits.

Claims of governmental privilege have been made throughout almost the entire history of our nation. They started with the trial of Aaron Burr and they have continued through the Watergate cases. President Thomas Jefferson asserted an executive privilege claim as to a letter written by General Wilkinson [really just an informer] and Richard Nixon said that tapes of his conversations were privileged. Chief Justice Marshall rejected the claim of Thomas Jefferson; Chief Justice Burger rejected the claim of Richard Nixon. Treating these cases as the alpha and the omega of privilege claims, the similarity of the Chief Justices' opinions is deserving of note.

Chief Justice Marshall was riding the circuit, and he wrote as a trial judge in both the treason and the misdemeanor trials of Aaron Burr. In both cases, Burr wanted to examine a confidential letter from General Wilkinson to Thomas Jefferson informing on Burr's conduct. President Jefferson claimed executive privilege. In the treason case, United States v. Burr, No. 14,692D, 25 Fed.Cas. 25, Chief Justice Marshall said:

"It is a principle, universally acknowledged, that a party has a right to oppose to the testimony of any witness against him, the declarations which that witness has made at other times on the same subject. If he possesses this right, he must bring forward proof of those declarations. This proof must be obtained before he knows positively what the witness will say; for if he waits until the witness has been heard at the trial, it is too late to meet him with his former declarations. Those former declarations,

---

**2.** Plaintiff does not explain its definition of "informer," but there is reason to suspect that plaintiff treats anyone it has located in the course of its investigation as an "informer." If "informers" in the conventional sense are involved, the only reason defendant would suspect them of acting in that capacity is because of the position taken by plaintiff. Defendant is not trying to find out how plaintiff located the persons having knowledge of material facts, and it does not ask if they are informers.

therefore, constitute a mass of testimony, which a party has a right to obtain by way of precaution, and the positive necessity of which can only be decided at the trial. . . ."

In the misdemeanor case, United States v. Burr, No. 14,694, 25 Fed.Cas. 187, the attorney general asked only that certain parts of the letter from General Wilkinson not be disclosed. Chief Justice Marshall recognized that there might be matters which the public interest would require be held in confidence, but he said:

"If this might be likened to a civil case, the law is express on the subject. It is that either party may require the other to produce books or writings in their possession or power, which contain evidence pertinent to the issue. In this respect the courts of law are invested with the power of a court of chancery, and if the order be disobeyed by the plaintiff, judgment as in the case of a nonsuit may be entered against him. . . . It is a very serious thing, if such letters should contain any information material to the defense, to withhold from the accused the power of making use of it. It is a very serious thing to proceed to trial under such circumstances."

United States v. Nixon (1974) 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, holds:

"The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense. . . .

"In this case the President challenges a subpoena served on him as a third party requiring the production of materials for use in a criminal prosecution on the claim that he has a privilege against disclosure of confidential communications. He does not place his claim of privilege on the ground they are military or diplomatic secrets. . . .

"In this case we must weigh the importance of the general privilege of confidentiality of presidential communications in performance of his responsibilities against the inroads of such a privilege on the fair administration of criminal justice. The interest in preserving confidentiality is weighty indeed and entitled to great respect. However we cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution.

"On the other hand, the allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts."

President Jefferson and President Nixon are the only two presidents who have prominently litigated a claim of executive privilege, [and I cannot believe that bureaucrats have more executive privilege than Presidents have] but it seems to be endemic with government employees to say that their agency is in sanctimonious hot pursuit of a Holy Grail which immunizes them from the demands of fair play and the requirements of due process of law. Based upon the number of reported decisions [several of which will be noted later] the Internal Revenue Service presently holds the track record as the most reluctant bureaucratic dragon in its claims of confidentiality, but other agencies are making a yeoman's effort to catch up. [The latest defeat suffered by the I.R.S. postdates United States v. Nixon. It is the decision of Columbia Court of Appeals in Tax Analysts and Advocates v. I. R. S. [8–18–74] 505 F.2d 350. There, letter rulings were held to be outside the intra-agency exemption of the Freedom of In-

formation Act, and the rulings which the non-party taxpayer attached to his return were ordered disclosed to a litigant other than the taxpayer.]

Boske v. Comingore (1900) 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846, is the keystone for claims of governmental privilege. Long before the days of our first income tax, the Commissioner of Internal Revenue said by regulation that collectors of internal revenue couldn't disclose their files to anyone. A Kentucky state court ordered an internal revenue collector jailed for contempt for refusing to disclose information concerning bonded whiskey which Kentucky wanted to subject to a property tax. The Supreme Court upheld the regulation under a statute which said that heads of departments could make regulations for "the custody, use, and preservation of the records." It was held:

"In our opinion the Secretary, under the regulations as to the custody, use, and preservation of the records, papers, and property appertaining to the business of his department, may take from a subordinate, such as a collector, all discretion as to permitting the records in his custody to be used for any other purpose than the collection of the revenue, and reserve for his own determination all matters of that character."

*Boske* led to United States ex rel. Touhy v. Ragen (1951) 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417. In a habeas corpus proceeding, a prisoner wanted F.B.I. files, and the agent in charge of the Chicago office refused to produce them, acting in reliance on Department of Justice Rule 3229. That rule said:

"If questioned, the officer or employee should state that the material is at hand and can be submitted to the court for determination as to its materiality to the case and whether in the best public interests the information should be disclosed. . . ."

The Supreme Court limited its opinion to the validity of the rule which prohibits "a subordinate of the Department of Justice to submit papers to the court in response to its subpoena duces tecum on the ground that the subordinate is prohibited from making such submission by his superior through order No. 3229." On authority of *Boske*, the rule was upheld.

By the time of United States v. Reynolds (1952) 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727, the statute relied on in *Boske* and *Touhy* remained unchanged in its language, but it had become 5 U.S.C. § 22. *Reynolds* held:

"*Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers.* Yet we will not go so far as to say that the court may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case. It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged."

Unquestionably, *Boske* and *Touhy* contributed to the promulgation and strict application of infamous IRS Regulation 80 which went far beyond the statutory privilege given tax returns. That regulation provided:

"All records in the offices or in charge of officers of internal revenue, responsible or subordinate, are in their custody and control for governmental purposes only. They have no control and no discretion with regard to the use of them for any other purpose . . . Internal Revenue officers are hereby prohibited from giving out any records . . . or to testify to facts coming to their knowledge in their official capacity without express authority from the Commissioner . . . . Whenever subpoenas shall have been served upon them they will . . . appear in court in answer thereto and respectfully decline to produce the records or give testimony called for, on the ground of being pro-

hibited therefrom by the regulations of the Treasury Department. Officers disobeying these instructions will be dismissed from service."

Public outcry against this IRS regulation and against government by administrative fiat and whimsical claims of executive privilege under all inclusive departmental regulations was answered by Congress in 1958. With *Boske* and *Touhy* grounded on what was by then 5 U.S.C. § 22 as statutory authority for agency regulations allowing secrecy, in 1958, Congress tried to take care of the situation by adding a sentence to that statute:

"This section does not authorize withholding information from the public or limiting the availability of records to the public."

This amendment knocked the judicially sanctioned prop out from under the bureaucratic privilege claims, but it didn't remedy the situation or slow down the claims. To the contrary, agency ardor for one sided litigation continued unabated, and litigants with the government faced the same uphill battle in attempting to learn the contents of government files important in the litigation—files which contained nothing but factual information which in many instances would prove that the citizen was right and the government was wrong. Congress recognized the continuing resistance to Congressional will as expressed in the 1958 amendment to 5 U.S.C. § 22 and it realized that the statute was not accomplishing its clear purpose. In desperation, in 1966, the Freedom of Information Act [5 U.S.C. § 552] was passed, but time has shown that Congress underestimated bureaucratic pertinacity, because the new statute has spawned a deluge of litigation.

In fact, the Supreme Court has spoken, but, in almost open defiance of the Court's commands, the executive privilege claims go on and on. In Environmental Protection Agency v. Mink (1973) 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119, the Supreme Court had this to say about the Act:

"Exemption 5 creates an exemption for such documents only insofar as they 'would not be available by law to a party . . . in litigation with the agency.' *This language clearly contemplates that the public is entitled to all such memoranda or letters that a private party could discover in litigation with the agency.* Drawing such a line between what may be withheld and what must be disclosed is not without difficulties. In many important respects, the rules governing discovery in such litigation have remained uncertain from the very beginnings of the republic. (United States v. Burr is cited as an example of this.) Moreover, at best, the discovery rules can only be applied under Exemption 5 by way of rough analogies. For example, we do not know whether the Government is to be treated as though it were a prosecutor, a civil plaintiff, or a defendant. Nor does the Act, by its terms, permit inquiry into particularized needs of the individual seeking the information, although such an inquiry would ordinarily be made of a private litigant. Still, the legislative history of Exemption 5 demonstrates that Congress intended to incorporate generally the recognized rule that 'confidential intra-agency advisory opinions . . . are privileged from inspection.'

. . . . . .

"In each case, the question was whether production of the contested document would be 'injurious to the consultive functions of government that the privilege of nondisclosure protects.' (citations omitted) Thus, in the absence of a claim that disclosure would jeopardize state secrets, see United States v. Reynolds, 345 U.S. 1 [73 S.Ct. 528, 97 L.Ed. 727] (1953), memoranda consisting only of compiled *factual material* or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery by private parties in litigation with the Government. . . . *It appears to*

*us that Exemption 5 contemplates that the public's access to internal memoranda will be governed by the same flexible, common-sense approach that has long governed private parties' discovery of such documents involved in litigation with Government agencies.* And, as noted, that approach extended and continues to extend to the discovery of purely *factual material* appearing in those documents in a form that is severable without compromising the private remainder of the documents." [emphasis supplied]

A host of lower court decisions reach a similar result, and two annotations stress the availability of factual information under the Freedom of Information Act. See, 7 A.L.R.Fed. 855, What are Intraagency and Interagency Memorandums or Letters Exempt from Disclosure under the Freedom of Information Act, and 17 A.L.R.Fed. 522, What Constitute Investigatory Files Exempt from Disclosure under Freedom of Information Act. Interesting reading is afforded in a law review article in 48 Tex.L.Rev. 1261, The Games Bureaucrats Play; Hide and Seek Under the Freedom of Information Act.[3]

■■■ Environmental Protection Agency v. Mink, *supra,* and many lower court decisions emphasize that the tests to be applied under the Act are the same tests applied under the discovery rules. Moreover, Congress has said, and the courts have stressed that where an agency wants to hold back its files, "the court shall determine the matter de novo and *the burden is on the agency to sustain its action.*" With the Supreme Court's pronouncement that the discovery rules and the Freedom of Information Act are pretty much co-extensive, a listing of some of the many cases in which agency claims of privilege have failed (both under the Act and under discovery rules) is

in order. A good starting point is to review the almost unbroken string of losses by the IRS—the most persistent of all the agencies in its unrelenting defiance of the requirements of disclosure.

Hawkes v. Internal Revenue Service (1972) 6 Cir., 467 F.2d 787, ordered production of IRS records. The case held that confidentiality was limited to situations in which "disclosure of information which, if known to the public, would significantly impede the enforcement process."

Long v. Internal Revenue Service (1972) D.C.Wash., 349 F.Supp. 871, "Factual material [in IRS files] does not come within the purview of the exception unless it is inextricably intertwined with the policy making process."

United States v. Gates (1964) D.C. Colo., 35 F.R.D. 524, represents Judge Doyle's views on the propriety of the IRS concealing factual information in its files. "As a matter of fairness and equity the government can not, in our view, be permitted to maintain a civil action against one of its citizens, relying for its case on documentary evidence respecting the intricacies of the family-company financial dealings which are under attack here, and at the same time refuse to permit the very family and company whose dealings are under attack to have access to the materials which appear at this juncture to provide the raw material both for the government's claim against these particular family members—and for their defense."

United States v. San Antonio Portland Cement Company (1963) D.C.W.D. Tex., 33 F.R.D. 513, made the IRS disgorge file information the taxpayer said was necessary to defend against a tax refund the government asserted was erroneously paid. Chief Judge Spears said: "It would be unconscionable, under the circumstances, for the Government

3. Other cases decided under 5 U.S.C. § 552 worthy of note are Sterling Drug v. F.T.C. (1971) 146 U.S.App.D.C. 237, 450 F.2d 698, Soucie v. David (1971) 145 U.S.App.D.C. 144, 448 F.2d 1067, United States v. Marchetti (1972) 4 Cir., 466 F.2d 1309, and Nichols v. United States (1971) D.C.Kan., 325 F.Supp. 130, aff'd. 10 Cir., 460 F.2d 671. In this case, a record was defined as something which is written or transcribed to perpetuate knowledge or events as a monument or memorial thereof.

to be permitted to prosecute this suit challenging its own prior determinations of defendant's tax liability, and then invoke governmental or attorney-client privileges, or the attorney's work-product doctrine, to deprive the defendant of matters which might be material to its defense. In this type of case the defendant should not be kept in the dark, but, on the contrary, a full disclosure should be made."

Timken Roller Bearing Co. v. United States (1964) D.C.Ohio, 38 F.R.D. 57, represents another refusal by the IRS to disclose information. "A careful reading of those depositions reflects a consistent reluctance to reveal any fact or criterion by which these agents determined that the deductions in issue were not 'necessary and ordinary' business expense. The most anyone has said is that in his opinion, the claimed expenditures did not relate to the sale of plaintiff's products. This motion represents the last avenue of discovery for the plaintiff to uncover the answer to that simple question: 'Why' ? . . . We are not confronted here with a cloak of secrecy around military information or state papers. The foundation of executive privilege is the unfortunately necessary policy of fettering justice to promote national health. It is, in effect, a choice between the lesser of two evils: on the one hand, we have half-informed litigants who sometimes get justice, if at all, by accident; on the other hand, we might have disruptive publicity of documents, plans and policies which by their very nature must be secret to be effective. . . . The Court gives no weight to cases decided on the strength of the 'housekeeping' statute. 5 U.S.C.A. § 22. The Supreme Court in Boske v. Comingore, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846 (1900), acquiesced in the executive misinterpretation of this statute and permitted the statute to be used to effect secrecy. However, since the 1958 amendment, it is no longer necessary to follow the Boske case; this was clearly pointed out in N. L. R. B. v. Capitol Fish Company, 294 F.2d 868, 875 (5th Cir. 1961)."

Campbell v. Eastland (1962) 5 Cir., 307 F.2d 478, was a temporary victory for the IRS. It was there held that the IRS didn't have to disclose files in a civil refund suit until after the trial of a companion criminal case. Judge Wisdom said, however, "In a mine-run civil case the discovery provisions of the Federal Rules of Civil Procedure apply to claims against the Government, *and courts have imposed sanctions upon the Government for disobeying orders to allow discovery*. Usually, when the taxpayer is seeking a refund or resisting payment of a tax deficiency assessed against him the United States is just another litigant. In such cases we start with the feeling that fundamental fairness to both sides—the Government starts with a great advantage in investigative resources—requires recognition of the taxpayer's right to pretrial discovery of the reports of the Internal Revenue Agents' who examined the taxpayer's books and records."

Talbott Construction Company v. United States (1969) D.C.Ky., 49 F.R.D. 68, recognizes a taxpayer's right to discovery of IRS files. Discovery was refused because there was no showing of good cause. The 1970 amendment of Rule 34 eliminates the necessity for such a showing. See, Abel Investment Company v. United States (1971) D.C.Neb., 53 F.R.D. 485.

Brown v. United States (1973) D.C. S.C., 58 F.R.D. 599, is the report of another loss by the IRS. That was a tax refund suit, and plaintiffs wanted to examine IRS files. "The court recognizes that, in the present case, the government did not come into the case as plaintiff, but apparently the only recourse left open to plaintiffs, if their cause be just, was to repair to the federal courts, or the tax courts, and have an impartial arbiter pass on the tax issues involved. No one could doubt but that the government forced the issue by assessing the tax. The government should occupy no position, better or worse, than any other litigant, unless some special circumstance exists." Judge Hemphill pointed out that Rule 501 of the proposed Rules of Evi-

dence are but an additional expression of requirements for production of factual matters.

Peterson v. United States (1971) D.C. Ill., 52 F.R.D. 317 was a tax refund suit. The taxpayer wanted to look at appellate conferee reports and field agent audit reports, and, as usual, the IRS refused discovery. This time, a different tack was taken by the IRS in fighting inspection, and the refusal this time was grounded on a contention that the reports were prepared in preparation for litigation which, under amended Rule 26 (b)(3) would require a showing of good cause. The court gave short shrift to this excuse, and, additionally, said: "Furthermore, the Government argues that a full and candid evaluation by its employees would be deterred if the court allowed the discovery sought. This argument is not persuasive. The purpose of IRS audits and appellate conferee investigations is to determine whether the investigated taxpayer should be assessed additional tax and to determine what such assessment should be. In this court's view, the mere fact that such government documents may be discoverable in some possible subsequent litigation would not, and should not, have any significant effect on the validity of such documents. . . . The Government, through its objections to Interrogatories Nos. 6 and 8, is seeking a favored position under the discovery rules. In a tax refund case, however, it should be treated as any other litigant."

In Abel Investment v. United States (1971) D.C.Neb., 53 F.R.D. 485, the facts were almost identical with those involved in Peterson v. United States, *supra*. The result was the same too. Judge Urbom said: "To some extent the government seems to be taking the position that because continuity can be shown from audit to litigation, in that each report is submitted to the person who must make the next determination in a process which may lead to trial, any report or document prepared by any link in the chain is prepared in anticipation of litigation. If this court were to so hold, it would in-deed put the government in a position markedly advantageous to that of a private litigant. I think that any government agency whose determinations might lead to litigation could show the same continuity, as all serve the same master; but to hold that any intra-agency or inter-agency report which eventually could be relayed to the attorney who must try the case for the government is a report or document prepared in anticipation of litigation would be effectively to shield all government reports. This is, I think, clearly contrary to the intent of Rule 26. The government further urges that the documents should be protected from disclosure as a matter of public policy because their disclosure would inhibit free and open discussion between officials. No contention is made that the documents contain secret material or that their disclosure would seriously compromise governmental security. Because the government's own affidavits state that the opinions written at the various levels are impartial and reflect the facts and law as the examiner finds them, I think that nothing in them should unduly embarrass the government."

In Simons-Eastern Company v. United States (1972) D.C.Ga., 55 F.R.D. 88, the IRS was ordered to produce the Appellate Division Supporting Statement, the District Conferee's Report, an RAR transmittal letter, a no change report, a pencil memorandum from an agent to a group supervisor and a supplemental report.

Tax Analysts and Advocates v. IRS (1974) 505 F.2d 350, *supra*, is the last of the many losses by IRS to be noted here.

General Services Administration v. Benson (1969) 9 Cir., 415 F.2d 878, indirectly involved a tax matter. Benson had tax problems, and to defend against the IRS, he needed GSA appraisals. The court ordered them disclosed.

Other agencies share the determination of the IRS to hide executive records, but those agencies have fared no better than have the IRS, President Jefferson, or President Nixon.

Ethyl Corporation v. Environmental Protection Agency (1973) 4 Cir., 478 F.2d 47, was a suit under the Freedom of Information Act to force disclosure of certain clean air records. They were ordered disclosed. "The legislative history of the Act makes it clear that the obligation to produce thereby mandated is to be construed broadly and the exemptions from such obligation narrowly. In short, the Act makes disclosure the rule and secrecy the exception. And, lest the Congressional purpose be thwarted by the inevitable tendency of the agency towards secrecy, Congress, discarding the usual principle of deference to administrative determinations, provided for any 'aggrieved citizen' denied disclosure a judicial remedy in the District Court, which was directed to 'determine the matter de novo', *with the burden on the agency itself 'to sustain' its claim for exemption.* By such provision, Congress imposed on the federal courts 'the responsibility of determining the validity and extent of the claim [of exemption], *and insuring that the exemption is strictly construed* in light of the legislative intent.' "

Ackerly v. Ley (1969) 4 Cir., 420 F.2d 1336, evidences something less than full agreement by the court with the privilege claims of the Commissioner of Food and Drugs. The suit was brought under the Freedom of Information Act to try to obtain information as to the reasons underlying a ruling barring carbon tetrachloride from the market. "We confess to a considerable lack of enthusiasm for the caliber of the Commissioner's performance in this seemingly erratic discharge of his responsibilities under the Freedom of Information Act. The records in question, which appellant sought in order to prepare his comments on the Commissioner's proposal in its preliminary stage, were made available to him at long last in con-

nection with the evidentiary hearing which it was the purpose of Congress, in the two-stage rule making prescribed by it, to render possibly unnecessary by common consent.[4] . . . The basis of Exemption (5), as of the privilege which antedated it, is the free and uninhibited exchange and communication of opinions, ideas, and points of view—a process as essential to the wise functioning of a big government as it is to any organized human effort. In the Federal Establishment, as in General Motors or any other hierarchial giant, there are enough incentives as it is for playing it safe and listing with the wind; Congress clearly did not propose to add to them the threat of cross-examination in a public tribunal. The problem is not the essential soundness of this policy but the inevitable temptation of a governmental litigant to give it an expansive interpretation in relation to the particular records in issue. The courts have, however, been dealing with this problem since long before the Freedom of Information Act was passed, and they can bring to the administration of the exemptions of that statute the common sense by which they have had to measure claims of executive privilege."

Tennessean Newspapers, Inc. v. Federal Housing Administration (1972) 6 Cir., 464 F.2d 657, arose when a newspaper wanted to run a story on certain appraisals made by the FHA, and the agency came up with the weathered cry of privilege. The court held the requirements of the statute to be mandatory and ordered that the appraisals be disclosed to the newspaper.

Grumman Aircraft Engineering Corporation v. Renegotiation Board (1970) 111 U.S.App.D.C. 79, 425 F.2d 578, struck down a claim of privilege under the Freedom of Information Act. ". . . the exemption was not meant to allow agencies to render documents

4. This is about what plaintiff here wants to do to defendant. Plaintiff thinks it fair to confront defendant with the case it must defend against a few days prior to trial.

confidential" by passing them back and forth among themselves."

Philadelphia Newspapers, Inc. v. Department of Housing (1972) D.C.Pa., 343 F.Supp. 1176 required the disclosure of appraisals. "Those courts which have reviewed the question of confidentiality have always required that the documents be deserving of some form of protection in themselves, and not because of their inclusion with other, arguably immune, documents or files."

Accordingly, under an almost unbroken line of authority, I hold that plaintiff here cannot play with defendant's hole card upturned and its hole card down under any claim of governmental or executive privilege, but this leaves for discussion the red herring claim of informer's privilege dragged into the case by plaintiff. Defendant made no inquiry asking for identification of "informers." Defendant asked who had information concerning the case, and whether a person acted as an informer or whether he was a witness located by plaintiff in the course of its statutorily mandated investigation is immaterial to defendant. In its thus far futile effort to find out what the case is all about, defendant presumably wants to interview or depose persons who know something about the facts of the phantom charge. Defendant wants to know the evidence it must prepare to rebut, and, of course, if plaintiff furnishes defendant with the names of all persons it has located who have knowledge of the facts, some of them may be able to give testimony helpful to defendant.[5] Although Berger v. United States (1935) 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, was a criminal case, what was there said as to the responsibilities of government lawyers is fully applicable to government counsel in civil cases:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

I think that government counsel should remember this mandate and I think defendant is entitled to know the names of persons having knowledge of the facts of the case—knowledge of facts favorable to the government and facts favorable to defendant.

As noted, defendant has made no inquiry as to the identity of persons who acted as "informers," and the suggestion that there may be informers involved is intelligence volunteered by plaintiff. Defendant doesn't ask how the government acquired its information—whether through informers or witnesses located during its investigation, and defendant doesn't really care how the government found these people. All defendant wants to do is to talk to persons having knowledge of the vague charges; to depose them if necessary; to use their testimony if helpful to defendant and to prepare to rebut it if hurtful. Fair play, a fair trial, and the requirements of due process of law demand that defendant be permitted to find out in advance of trial what the case is all about.

But, in light of plaintiff's adamant insistence that defendant go to trial on unspecified charges, I shall discuss the EEOC informer claim just a little bit. As is true under all claims of informer's privilege, plaintiff starts with Roviaro v. United States (1957) 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. The only part of the case plaintiff wants to read is the part which says that there is such a thing as an informer's privilege, and plaintiff ignores the fact that disclosure was held essential in Roviaro and plaintiff skips by the holding that:

"The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of

5. Brady v. Maryland (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, orders that exculpatory information must be furnished a defendant in a criminal case. A defendant in a civil case brought by the government should be afforded no less due process of law.

a communication *will not tend to reveal the identity of an informer,* the contents are not privileged. . . . A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action."

As I read the case, *Roviaro* hurts rather than helps plaintiff—especially in view of the fact that defendant just wants to know who has relevant information and isn't interested in whether plaintiff located those persons in its investigation or whether they "informed" on defendant. United States v. Williams (1973) 10 Cir., 488 F.2d 788, doesn't help plaintiff any. It holds:

"As a general rule in cases of this kind, the government must identify an informant who participates with undercover agents in transactions which are for the purpose of obtaining evidence of crimes and whose testimony might be relevant to the defense. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); United States v. Martinez, 487 F.2d 973 (10th Cir. 1973); Garcia v. United States, 373 F.2d 806 (10th Cir. 1967). In addition to requiring the disclosure of the informant's identity, the trend of the decisions has been, upon demand of the defendant, to require the prosecution to produce the informer at the time of trial. If the informer is not available, it is incumbent upon the government to show reasonable diligence in its effort to produce him."

In United States v. Martinez (1973) 10 Cir., 487 F.2d 973, Judge McWilliams quoted with approval from Garcia v. United States (1967) 10 Cir., 373 F.2d 806:

" 'It seems to be settled that the government may be required to disclose the identity of an informer if his testimony might be relevant to the defense and it is made to appear on balance that justice would be best served by the disclosure.' "

Justice would surely be best served by requiring the disclosure of persons having knowledge of the facts without requiring any disclosure of whether those persons acted as informers. The elimination of circumstances under which the information was obtained for the most part disposes of the cases on which plaintiff here relies in support of its effort to force defendant to a trial in the dark, but I shall mention seriatim as they appear in plaintiff's brief the cases relied upon by plaintiff in support of its position.

In Wirtz v. B. A. C. Steel Products, Inc. (1962) 4 Cir., 312 F.2d 14, before pretrial, "plaintiff furnished a list of all persons known to have information pertaining to the issues and a summary of the information known to them, but declined to name its witnesses. . . . The only information which the defendants did not have, and the real purpose of their demand, was to find out which of the present and former employees had informed against them, and the tone and manner of their informing; i. e., whether it had been voluntarily offered or reluctantly given. It is this very information which is protected under the 'informer's privilege.' " The case is of no help to the EEOC. In *B.A.C.*, the Secretary supplied the exact information here requested by defendant, and if plaintiff will just do what Secretary Wirtz did voluntarily in *B.A.C.*, defendant will have the information it wants.

United States v. Hemphill (1966) 4 Cir., 369 F.2d 539, is of no more help to plaintiff. There, "the plaintiff did supply the attorneys for the defendants with a list of all persons whom the plaintiff had reason to believe had information about the controversy. It has no objection to furnishing the names of

all witnesses it proposes to use or to furnishing the defendants with the written statements obtained from any persons who are offered as witnesses." The court did hold that the government was not required to say who acted as a confidential informant, but Zia doesn't want to know this. The Court cited with approval Wirtz v. Hooper-Holmes Bureau, Inc. (1964) 5 Cir., 327 F.2d 939—a case omitted from plaintiff's brief. In *Hooper-Holmes*, the Secretary refused to list his witnesses in the pretrial order, and the district court dismissed the case. The dismissal was affirmed on authority of Globe Cereal Mills v. Scrivner (1956) 10 Cir., 240 F.2d 330, a case in which I was counsel for appellee, and in which Judge Breitenstein's trial court ruling refusing to permit an unlisted witness to testify was affirmed.

No more does Mitchell v. Roma (1959) 3 Cir., 265 F.2d 633, aid the EEOC. A claim of privilege was made to an interrogatory asking names of persons who had furnished written statements to plaintiff, but this interrogatory followed plaintiff's voluntary listing of "85 persons, employees or former employees of the defendants, known or believed to have knowledge concerning these matters." The court distinguished Fleming v. Bernardi (1941) D.C.Ohio, 1 F.R.D. 625, on the ground that, "it is to be noted that, unlike our case, the interrogatory did not ask for the identity of any informer." Nor do Zia's interrogatories seek that information. In Mitchell v. Roma, this comment was made: "The fact that a person has knowledge doesn't mean that he has informed others of this knowledge. . . ."

Wirtz v. Continental Finance & Loan Co. of West End (1964) 5 Cir., 326 F.2d 561, is inapposite. Defendant asked for the names of persons who had filed complaints. "The Secretary refused to answer these interrogatories but he did furnish a list of forty-five persons who 'have knowledge or believed by plaintiff to have knowledge of facts relevant to the trial of the issues.'" The court

held that identifying the persons who had complained was not relevant.

> "The question is whether, with respect to certain employees, the Act's requirements as to payment of hourly wages were violated. What possible difference does it make who reported to the Secretary that violations had occurred. . . . (I)t may be that ten or twelve employees may have reported or informed as to alleged violations. In such circumstances the only conceivable need for the names of the informers would be the desire of the employer to know who had informed on it. This is not a relevant issue to the cause before the trial court."

Wirtz v. Robinson & Stephens, Inc. (1966) 5 Cir., 368 F.2d 114, holds only that plaintiff could not be required to name persons who had furnished written statements. The court reaffirmed its decision in Wirtz v. Hooper-Holmes Bureau, Inc., *supra*, but concluded:

> "Here we think the order tends toward disclosure of informers. Worse, each witness who has given a statement will be suspected of being an informer."

Read in the light most favorable to plaintiff here, Wirtz v. Robinson & Stephens, Inc. is of little aid to plaintiff. It is true that the case holds that a listing of witnesses cannot be required "as a part of the discovery process," but our case has already gone through an abortive pretrial conference, and in *Robinson & Stephens, Inc.* it was said:

> "The question of whether the Secretary might be compelled to list his witnesses at a pretrial hearing was answered in the affirmative in Wirtz v. Hooper-Holmes Bureau, Inc., 5 Cir. 1964, 327 F.2d 939."

Hodgson v. Cornhusker Packing Company (1970) D.C.Neb., 51 F.R.D. 515, is Mitchell v. Roma, *supra*, replayed. The Secretary was not required to furnish the names of persons who had given written statements, and that is all the case holds. "Which employee or em-

**1386**

ployees volunteered information to the government with regard to the alleged improper payments and alleged improper record keeping is, in the Court's opinion, irrelevant."

Pettway v. American Cast Iron Pipe Company (1969) 5 Cir., 411 F.2d 998, is not remotely in point. It holds only that an employee can't be fired for filing a maliciously false charge with the EEOC, and that hasn't got anything to do with the case at bar. It was held that the libel was privileged because, "that protection must be afforded to those who seek the benefit of statutes designed by Congress to equalize employer and employee in matters of employment." Equality means a two way street. When an employer is sued by the EEOC, the employer has the same discovery rights as does the EEOC, and flimsy claims of privilege will not be recognized to further a desire by the EEOC to fight an opponent one of whose hands the EEOC wants to tie behind its opponent's back. This case will be decided on all of its facts, and the defendant will have a right to find out what the facts are, and it will have an opportunity to answer specific accusations and charges made against it. For the EEOC to be required to do the very thing volunteered by the Secretary of Labor in the cases relied on by the EEOC isn't going to prejudice plaintiff's case and it isn't going to reveal who acted as a confidential informer. But defendant can then depose persons having knowledge of the facts; it can prepare to rebut testimony adverse to it; it can plan to use testimony favorable to it. Whether the knowledgeable persons volunteered their information isn't relevant, but the information is. Paraphrasing the words of Chief Judge Connell in Timken Roller Bearing Co. v. United States, *supra*, defendant here will not be required to hope for only "accidental justice."

Plaintiff will be ordered to disclose the names of all persons known to it or believed by it to have knowledge of the facts of the case. Plaintiff will not be required to disclose which of those persons acted as "informers," using the word in its usual sense. It will not be required to disclose to defendant at this time any written statements furnished or taken from such persons. [Whether a rough approximation of 18 U.S.C § 3500 will be applied at time of trial will be decided at trial or shortly before trial.] Plaintiff will be required to furnish defendant with a list of witnesses plaintiff presently intends to call. This does not mean that plaintiff cannot list additional witnesses later, but, in the event of later listing of additional witnesses, the burden will be on plaintiff to show why the names of those witnesses could not be furnished at this time [Surely, plaintiff must know most of its witnesses now, or it could not have ethically filed its lawsuit.] In the absence of an adequate showing as to why the name of a witness could not be furnished at this time, witnesses later identified will not be permitted to testify.

One final comment will bring this opinion to a close. There is no justification for taking as much of a court's scarce time as has been required for the hearing held on this matter and for the inordinately long opinion which has been written in faint hope that government counsel can be persuaded to live within the spirit of the rules. Entitlement to receipt of a government paycheck is not a license to interfere with or to attempt to interfere with the fair administration of justice. Government files are not sacrosanct, and government employees are going to have to learn to live with the concept that even in their official capacity, they ordinarily have no fewer and no more rights in a lawsuit than does their adversary, although, reluctantly, I must now mention a special status which has been given government litigants.

Rule 37 of the Federal Rules of Civil Procedure was amended in 1970 in an important particular. Although, prior to 1970, an award of expenses and attorneys' fees was not ordinarily made, Rule 37(a)(4) now provides:

"If the motion is granted, the court shall, after opportunity for hearing require the party or deponent whose

conduct necessitated the motion or the party *or attorney advising such conduct* or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust."

If the shoe were on the other foot, unhesitatingly I would award expenses, including attorney's fees, against defendant, and I very much would like to award them against the EEOC. Unfortunately, I can't. Rule 37(f) confers a special "privilege" on the government to be contumacious:—"Except to the extent permitted by statute, expenses and fees may not be awarded against the United States under this rule." Perhaps this doesn't immunize government counsel from an award against them personally, but in light of all of the circumstances, I think that a personal award against counsel would be unjust—at least it would be unjust this time around.