**UNITED STATES of America, Plaintiff,**

v.

**Benjamin JAMIL, Defendant.**

**No. 81 CR 687(S).**

United States District Court,
E. D. New York.

July 1, 1982.

his Sixth Amendment rights by recording a conversation among himself, his trial attorney and an informer. The latter had been equipped by government investigators with a Nagra recorder after the United States Attorney and the investigators became aware that the attorney had been retained in the matter. For the reasons stated below, the motion to dismiss on Sixth Amendment grounds must be denied. The court has considered less drastic relief warranted by ethical principles, power to supervise counsel, authority to redact and the balancing principles of Rule 403 of the Federal Rules of Evidence. For the reasons indicated below, the recording will not be admitted at the trial on the direct case of the government.

## FACTS

A pretrial hearing established the following facts. An export shipment of defendant's merchandise had been seized at the airport by Customs. Customs agents had executed a search warrant for his place of business in the presence of both the defendant and his attorney retained for the matter. Defendant was a target of a pending grand jury investigation; an indictment was likely. There had been meetings between defense counsel and the Assistant United States Attorney concerning the probable prosecution. Government Customs agents who conducted the search were explicitly told by counsel not to speak to defendant without the attorney's permission. The Assistant United States Attorney did not have to be told—he was aware that to do so under the circumstances would be to violate plain ethical standards as well as policy of the United States Attorney's office for this district. (See Record June 7, 1982 at pp. 31, 83.)

Fortuitously, some two weeks after the search of defendant's offices, the Customs agents on the case found themselves with a willing informer, one of defendant's customers, who volunteered to tape record a planned business meeting with defendant. The informer's action was in part self-protective, for he was concerned that defend-

Edward R. Korman, U. S. Atty., E.D.N.Y. by David V. Kirby, Asst. U. S. Atty., Brooklyn, N.Y., for plaintiff.

Barry Ivan Slotnick, New York City, for defendant.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge:

Defendant is charged with the violation of statutes prohibiting the sale of electronic eavesdropping devices in this country and the export without a license of equipment with potential military use. 18 U.S.C. §§ 2512(1)(a), (b), (c); 22 U.S.C. §§ 2778(b)(2), (c). He moves to dismiss on the ground that the government violated

ant, a purveyor of bugging and anti-bugging devices, would be recording the conference. This fear was not unfounded since the defendant was during this period arranging to record the conversation of a chief-witness against him at what that witness thought was a friendly reunion with a former fellow-worker.

■ When the Customs officers outfitted the informer with a taping device he became an agent of the government for the purpose of recording the meeting. Suitably instructed and encouraged by these law enforcement officials the informer and his son had the meeting as planned—with one exception: defendant appeared with his attorney. As a result, both the attorney's and the defendant's voices as well as those of the informer and his son were captured on the tape.

The transcript reveals a trilingual conversation—Arabic, French and English—among businessmen and the attorney of one of them with respect to future and past deals for electronic equipment, letters of credit, the need for export licenses and delays in shipments. Whenever the informer seeks to direct the discussion towards defendant's material already seized by Customs, or to put on the record defendant's prior knowledge about the need for export licenses, he is counselled by his attorney not to answer. Typical is the following:

John Sayegh: Why the merchandise was seized why why did they do that?

Ben Jamil [Defendant]: I can't talk about that.

John Sayegh: (Arabic).

Joe Sayegh: (Arabic).

Barry Slotnick [Attorney for Defendant]: On advice of his attorney because this litigation going back and forth I don't want him to discuss it.

Joe Sayegh: (French)

Barry Slotnick: Ah the letter of credit expires October 31, 1979.

Joe Sayegh: (French).

John Sayegh: This is for the a second.

Joe Sayegh: (Arabic).

. . . .

Ben Jamil: You said transit Jedda, I said in order for me to get a export license I need a final destination. He said I can't give you a final destination then I won't be

John Sayegh: To Beruit destination

Ben Jamil: You never said that, you never said that

Joe Sayegh: To Beruit (Arabic),

Ben Jamil: You decide.

Joe Sayegh: To Beruit from shipment to transit Jedda to Beruit.

Barry Slotnick: Can I do the following let me make a suggestion you obviously want the merchandise to Beruit I have to find out what proper and appropriate licenses that Mr. Jamil should submit and he'll do it legally. He is not going to do anything illegal that's why he wouldn't ship it in the first place. Now if you want this merchandise Mr. Jamil will check through my office to find out what licenses are necessary.

Joe Sayegh: No problem.

Barry Slotnick: It has got to be done legally.

Joe Sayegh: (Arabic).

John Sayegh: A he wants to get this done.

Joe Sayegh: Inaudible.

John Sayegh: As much as you can.

Ben Jamil: Had he followed my advice 4 weeks ago he would have it because the export license only take 3 to 4 weeks we told this to Bastos he said no I can't wait three or four weeks I need it right away.

John Sayegh: (Arabic)

Joe Sayegh: No no (Arabic)

John Sayegh: He told you that he would stay ten days

Joe Sayegh: Ten days ten days

John Sayegh: For the license if you need it, but you but you said no it can be shipped.

Joe Sayegh: Arabic

Ben Jamil: I don't remember, I don't remember you saying 10 days I remember you said I have to have it this weekend.

John Sayegh: Okay whats the black guy why did he come to the office and

Barry Slotnick: Let me stop you John now I have not to stop you I am his lawyer I don't want you questioning Ben (inaudible).

The United States Attorney was not privy to the electronic arrangements attending the investigation. But he is eager to use the fruits. Defendant, having had his anti-bugging net breached, and surprised that the government's sense of sportsmanship and trust among friends was no higher than his own, seeks protection from the law.

## LAW

### I. *Sixth Amendment*

■ Defendant's contention that the indictment must be dismissed because his Sixth Amendment rights were violated is not supported by current federal caselaw. His Sixth Amendment right to counsel was not applicable. He was not in custody. *See Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *United States v. Vasquez*, 675 F.2d 16 (2d Cir. 1982). No adversarial proceedings had been commenced against him. *See Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The fact that he had become the subject of a grand jury investigation is insufficient. *United States v. Vasquez, supra.*

■ There was no impermissible intrusion of the government's ear into the privacy of the attorney-client relationship that might have revealed privileged information placing a Sixth Amendment taint on the entire prosecution. *Cf. United States v. Levy*, 577 F.2d 200 (3d Cir. 1978) (privy to defense strategy); *United States v. Rispo*, 460 F.2d 965, 977 (3d Cir. 1972) (per se exclusionary rule); *United States v. Lusterino*, 450 F.2d 572 (2d Cir. 1971) (privy to defense strategy); *Caldwell v. United States*, 205 F.2d 879 (D.C.Cir.1953) (government informer also defense assistant gained access to defense planning), *cert. denied*, 349 U.S. 930, 75 S.Ct. 773, 99 L.Ed. 1261 (1955); *Coplon v. United States*, 191 F.2d 749, 757 (2d Cir. 1951) ("private consulta-

tion" a requirement of "effective aid"), *cert. denied*, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952); *United States v. Orman*, 417 F.Supp. 1126 (D.Colo.1976) (intrusion itself without showing of prejudice suffices). The presence of a third party at what purported to be a business conference precludes the conclusion that what was said constituted a privileged communication. *United States v. Melvin*, 650 F.2d 641, 645–46 (5th Cir. Unit B. 1981); *United States v. Gartner*, 518 F.2d 633, 636–37 (2d Cir.), *cert. denied*, 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975).

### II. *Ethical Limitations*

### A. *Communication with Opposing Counsel's Client.*

■ Canon 7 and Disciplinary Rule 7–104(A)(1) of the ABA Code of Professional Responsibility prohibit an attorney from communicating with a person of adverse interest who is represented by counsel. The rule is a modern version of Hoffman's Resolution XLIII which had been followed from time immemorial by the Anglo-American bar, that "I will never enter any conversation with my opponent's client relative to his claim or defense except with the consent and in the presence of his counsel." D. Hoffman, A Course of Legal Study II, at 751 (2d ed. 1836). The principle as it now appears in DR 7–104(A)(1) forbids a lawyer during the course of his representation of a client to:

> communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter, unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

The current American Bar Association proposed revision of the Code of Ethics retains the principle virtually unchanged. *See* ABA Commission on Evaluation of Professional Standards, Final Draft of Model Rules of Professional Conduct, Proposed Rule 4.2 with comments and notes (Oct. 1981).

This salutary rule is fundamental to the effective functioning of the legal profession. There could be no reliable attorney-client relationship without an ethical shield against improper approaches to opposing counsel's client. ABA Comm. on Professional Ethics, Opinions, No. 108 (1934). The ethical prohibition protects an adverse party from the imbalance of skill and knowledge between laymen and lawyers. *Massiah v. United States*, 377 U.S. 201, 211, 84 S.Ct. 1199, 1205, 12 L.Ed.2d 246 (1964) (dissent); Kurlantzik, The Prohibition on Communication with an Adverse Party, 51 Conn.B.J. 136, 138–45 (1977). So vital is this standard to ethical practice that an attorney must guard against even an inadvertent or negligent bypass of opposing counsel. American Bar Foundation, Annotated Code of Professional Responsibility, Communicating With One of Adverse Interest, EC 7–18 and DR 7–104 Comment, 331, 332–33 (1979).

B. *Applicability to Government Prosecutors.*

As late as the nineteen-fifties there were apparently no reported court decisions and only two ethics opinions dealing with the applicability of Canon 7 (then Canon 9) to a criminal case. *See Lee v. United States*, 322 F.2d 770, 777 (5th Cir. 1963); *Ricks v. United States*, 334 F.2d 964 (D.C.Cir.1964); *Mathies v. United States*, 374 F.2d 312 (D.C. Cir.1967); ABA, Opinions of the Comm. on Professional Ethics and Grievances, Decision 249, at 640 (1957); ABA Comm. on Professional Ethics, Opinions, No. 150 (1936). *Cf.* H. Drinker, Legal Ethics 201–03 (1953) (citing civil examples only). *See generally* Broeder, "*Wong Sun v. United States*: A Study in Faith and Hope," 42 Neb.L.Rev. 483, 603 (1963); Note, "Criminal Law & Procedure, Right to Counsel, In-Custody Interrogation—*Coughlan v. United States*," 20 Hastings L.J. 958, 962 n.33 (1969). Now, however, there can be no doubt that the Code controls lawyers' behavior in both civil and criminal matters. *See, e.g.*, DR 7–103 (duties of public prosecutor); DR 7–107(A), (B) (trial publicity); EC 7–13 (higher duties of prosecutor); EC 7–14 (same). There is unanimous and fully documented authority for the proposition that prosecutors are no less subject to the prohibition against communication with a represented person than are members of the private bar. *See United States v. Thomas*, 474 F.2d 110, 112 (10th Cir.) (accused; statement taken by agent after appointment of counsel; rule of ethics applies and statement "may not be offered"), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *United States v. Springer*, 460 F.2d 1344, 1354 (7th Cir.) (ethical code applicable "to both civil and criminal [cases as] .. part of supervisory power"), *cert. denied*, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972); *Coughlan v. United States*, 391 F.2d 371, 376 (9th Cir.) (dissent), *cert. denied*, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); *People v. Green*, 405 Mich. 273, 274 N.W.2d 448, 452 (1979) (dissent); *State v. Yatman*, 320 So.2d 401, 403 (Fla.Dist.Ct.App.1975) (knowing communication constitutes "grossest form of unethical conduct" by prosecuting attorney); *People v. Skinner*, 52 N.Y.2d 24, 30, 436 N.Y. S.2d 207, 209, 417 N.E.2d 501 (1980) ("We would be hard pressed logically to proscribe such conduct in the civil context yet blithely overlook it in the criminal sphere."); *People v. Hobson*, 39 N.Y.2d 479, 485, 384 N.Y.S.2d 419, 423, 348 N.E.2d 894, 898 (1976) ("grossly incongruous . . . to blink its violation in a criminal matter"); ABA, Opinions of the Comm. on Professional Ethics and Grievances, Decision 249, at 640 (1957); ABA Comm. on Professional Ethics, Informal Opinions, No. 1373 (1976); ABA Standards, The Prosecution Function § 1.1(d) (1971) ("It is the duty of the prosecutor to know and be guided by the standards of professional conduct as defined in codes and canons of the legal profession . . . ."); American Bar Foundation, Annotated Code of Professional Responsibility, Communicating With One of Adverse Interest, EC 7–18 and DR 7–104 Comment, 331, 339 (1979).

■ Exempting lawyers in the public service from the rules of ethical conduct would put the legal professional in the "indefensible and intolerable position," Broeder,

"*Wong Sun v. United States*: A Study in Faith and Hope," 42 Neb.L.Rev. 483, 602 (1963), of demanding greater propriety in money matters while abiding lesser rectitude in criminal matters where life and liberty are at stake and the policy considerations are "stronger." ABA Comm. on Professional Ethics, Informal Opinions, No. 1373 (1976). Public prosecutors are not above the law of the profession any more than they are above the law of the land. *Cf. Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). "The judiciary as well as the public is dependent upon professional ethical conduct of attorneys and thus has a significant interest in assuring and maintaining high standards of conduct of attorneys engaged in practice," whether civil or criminal. *Middlesex County Ethics Committee v. Garden State Bar Association*, —— U.S. ——, ——, 102 S.Ct. 2515, 2523, 73 L.Ed.2d 116 (1982).

## C. Client is a "Represented Party" Before Criminal Proceeding Commences.

 A person who retains counsel to protect him when he is a target of a grand jury investigation is, within the definition of DR 7–104(A)(1), a "represented party." Any more exclusive definition of a party as a person or entity by or against whom a proceeding has been commenced is not serviceable for purposes of construing the ethical rule. While for many purposes a person may not become a party to a criminal action (that is an "accused" with Sixth Amendment rights) until some adversarial proceeding has been commenced, in the context of the ethical code it is sufficient that the client is being investigated as a possible defendant in a potential criminal proceeding. *Cf.* ABA Comm. on Professional Ethics, Informal Opinions, No. 1149 (1970) (insured in subrogation action may not be contacted by opposing counsel although insured is not the real party in interest); ABA Comm. on Professional Ethics, Opinions, No. 95 (1933) (once claim against municipality has been "put in the hands of an attorney for attention" it is improper for police officers, clients of the municipal at-

torney, to obtain written statements from represented claimant); NYCBA Comm. on Professional Ethics, Opinions, No. 302 (1934) (attorney for defendant may not make settlement offer directly to injured party who has retained an attorney although no suit has been instituted); NYCBA Comm. on Professional Ethics, Opinions, No. 101 (1928) (attorney may not interview for fact-finding purposes opposing party represented by counsel in connection with a demand for money damages although suit has not been commenced). The rule proscribes communication on the "subject of representation." *Cf.* ABA Canons of Professional Responsibility No. 9 (1908) (prohibiting communication on the "subject of controversy"), *reprinted in* H. Drinker, Legal Ethics 312 (1953). Its application depends upon the existence of the attorney-client relationship, not upon the existence of a pending lawsuit. *See* NYCBA Comm. on Professional Ethics, Informal Opinions, No. 79–13 (1979) (proscription continues post-judgment so long as the attorney-client relationship has not terminated).

A contrary view cannot be based on the fact that DR 7–104(A)(1), dealing with communications, uses the term "represented party" while DR 7–104(A)(2), covering advice, employs the term "represented person." Ethical Consideration 7–18 itself eschews the formalistic distinction in favor of an admonition to the attorney not to "communicate on the subject matter of the representation of *his* client *with a person* he knows to be represented in the matter." (Emphasis added.) *See also* Clark & Wolfran, "Professional Responsibility: Issues for Minnesota Attorneys," Minn. State Bar Ass'n Continuing Legal Education 726–27 (1976) (word adverse in heading of the disciplinary rule should be ignored as a limitation on the application of the rule).

 Here the defendant had clearly become the target of the investigation and prosecution by indictment was imminent. Had the government at that time sought his testimony before the grand jury, the prosecutor would have been obliged to inform him that he might be charged and

that he would be well advised to seek independent legal counsel. *United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976) (suppression and dismissal on the basis of supervisory powers), *cert. dismissed as improvidently granted*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978); ABA Standards, The Prosecution Function § 3.6(d) (1971). This practice of advising targets of their right to counsel, while not constitutionally mandated, *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), is followed voluntarily and by court order in this circuit. *United States v. Jacobs, supra.* It evinces an understanding of both prosecutors and courts that becoming the target of a grand jury proceeding, while not an adversarial event of constitutional dimension, is a grave enough development to warrant retention of an attorney. It hardly needs to be added that advising a target of the need for counsel and then undercutting that counsel by direct contact between government agents and the client vitiates the *Jacobs* rule.

This expansive definition of a party to include a person who is a potential litigant is reflected in such cases as that covered in ABA Comm. on Professional Ethics, Informal Opinions, No. 1373 (1976). The Committee on Professional Ethics found that DR 7–104(A)(1) prohibited a district attorney from sending an attorney's client a copy of a plea offer letter, the original of which was sent to the attorney; the matter was only under investigation and the client had yet to be indicted. *But cf.* ABA Comm. on Professional Ethics, Informal Opinions, No. 908 (1966); *W.T. Grant Co. v. Haines*, 531 F.2d 671, 674 (2d Cir. 1976) (it is not unethical behavior for attorney for potential plaintiff to interview potential defendant "so long as the latter knows that the statement is being taken by the lawyer in his status as attorney for the plaintiff"). A court exercising its supervisory powers in the service of DR 7–104(A)(1) should enforce the rule even though there are no formal parties to a pending litigation. *See In re FMC Corp.*, 430 F.Supp. 1108 (S.D.W. Va.1977).

Viewing the rule in light of its purpose makes clear that a rigid notion that ethical obligations commence only when a criminal proceeding begins is not in harmony with the spirit of the Code. The rule is crafted to protect a client from squandering a possible claim or defense and to insure against disclosure of privileged information. These concerns are fully implicated by the time a client becomes aware that he is a focus of suspicion, and the government attorney knows he is represented and undertakes to confer with counsel on the matter. In white-collar crimes—and the instant case reflects a growing emphasis on such matters by federal prosecutors—the most critical phase is often before indictment; it is then that the skilled attorney uses persuasion and negotiation to forestall or shape the potential prosecution. Under DR 7–104(A)(1) it is not material ethically that the client has not technically become a party by indictment, arraignment or arrest.

D. *Communication—Direct or Indirect—Moment of Violation.*

Any direct communication between the Assistant United States Attorney, or a representative of his office, and the defendant occurring after the government became aware that he was represented by counsel would constitute a violation of DR 7–104(A)(1). The government notes, however, that the meeting was with a Customs officer's informant and all of the arrangements were made by Customs personnel, who as non-lawyers are not subject to the Code. *See Massiah v. United States*, 377 U.S. 201, 210–11, 84 S.Ct. 1199, 1205, 12 L.Ed.2d 246 (1964) (dissent) (co-defendant); *United States v. Ferguson*, 243 F.Supp. 237, 238–39 (D.D.C.1965) (FBI agent; suggesting, however, possible inadmissibility of evidence); *State v. White*, 494 S.W.2d 687, 692 (Mo.Ct.App.1973) (police); ABA Comm. on Professional Ethics, Informal Opinions, No. 1193 (1971) (lay investigators).

While the United States Attorney's office neither authorized nor participated in the plan, it is arguable that the Customs agents were constructively under the control of,

and acting as the agents of, the United States Attorney. *Cf.* ABA Comm. on Professional Ethics, Opinions, No. 95 (1933) (municipal attorney responsible for acts of police officers under his supervision and control; officers are agents of the client municipality and attorney cannot sanction acts by his client which he himself may not perform). The circumstances of this case do not warrant such a legalistic approach. Fairness here prevents finding the Assistant United States Attorney guilty of a violation. He should not be held to have operated unethically when it is apparent that he was quite unaware of the eavesdropping until after the event. There is nothing to suggest that he indirectly encouraged the contact or intentionally shut his eyes to improprieties he knew others would commit. *Cf.* Broeder, "*Wong Sun v. United States*: A Study in Faith and Hope," 42 Neb.L.Rev. 483, 602 (1963). The Customs agents were not acting as the alter ego of the prosecutor. *See United States v. Massiah*, 307 F.2d 62, 66 (2d Cir. 1962), *rev'd*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

 The prosecutor cannot, however, avoid responsibility for what he himself does at trial. An ethical violation would occur at the moment the evidence is introduced over defendant's objection. He cannot, under the Canon, "take advantage of statements obtained from . . . a person represented by counsel in the absence of counsel." *State v. White*, 494 S.W.2d 687, 692 (Mo.Ct.App.1973). *See also United States v. Thomas*, 474 F.2d 110, 112 (10th Cir.) (excluding on ethical grounds statement taken by agent, who may not have known defendant was represented, without the knowledge of the United States Attorney, when the latter did know counsel was in the case), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973).

In seeking to use the transcript, the United States Attorney would make himself a party to the conversation after the fact. He cannot seek to benefit from what would have been an impropriety had he approved the wire. *United States v. Four Star*, 428

F.2d 1406 (9th Cir.) (prosecutor who "takes advantage of its results violates professional ethics"), *cert. denied*, 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253 (1970); *Schantz v. Eyman*, 418 F.2d 11, 13 (9th Cir. 1969) (prosecutor cannot use confrontation with state psychiatrist), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1259, 25 L.Ed.2d 530 (1970); *Coughlan v. United States*, 391 F.2d 371, 376 (9th Cir.) (dissent), *cert. denied*, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); *United States v. Wedra*, 343 F.Supp. 1183, 1188 (S.D.N.Y. 1972). By introducing the tape the prosecutor effectively places himself, the jury, and even the court, at the keyhole, listening to the conversation. In effect, each of them is a party to the surreptitious recording as it is reproduced in the courtroom, thus becoming "accomplices in wilful disobedience" of rules of ethics. *McNabb v. United States*, 318 U.S. 332, 345, 63 S.Ct. 608, 615, 87 L.Ed. 819 (1943). *Cf. Elkins v. United States*, 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960); *Mesarosh v. United States*, 352 U.S. 1, 14, 77 S.Ct. 1, 8, 1 L.Ed.2d 1 (1956). The position is one almost any American lawyer, whether in a civil or criminal case, would find uncomfortable to the point of embarrassment. *See, e.g., United States v. Sam Goody, Inc.*, at 4 n.3, CR 80–507 (E.D. N.Y. July 27, 1981). ("[W]e believe that it was unethical for the government to 'wire' an informant and send him to one of the defendants' offices in an attempt to elicit incriminating statements *after* that defendant's attorney had presented himself to the prosecutor and told him to deal with his client only through him (the attorney). *See Code of Professional Responsibility*, DR 7–104.") (Emphasis in original).

E. *Federal Rule.*

Nevertheless, a number of federal cases suggest that DR 7–104(A)(1) is coextensive with the Sixth Amendment. *See, e.g., United States v. Henry*, 447 U.S. 264, 275 n.14, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980) (citing disciplinary rule but noting "it does not bear on the constitutional question"); *Massiah v. United States*, 377 U.S. 201, 210, 84 S.Ct. 1199, 1205, 12 L.Ed.2d 246 (1964) (dissent) (ethical canons "are not of

constitutional dimension"); *United States v. Vasquez*, 675 F.2d 16 (2d Cir. 1982); *United States v. Kenny*, 645 F.2d 1323, 1339 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Lemonakis*, 485 F.2d 941 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974); *United States v. Springer*, 460 F.2d 1347 (7th Cir.), *cert. denied*, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972); *Mathies v. United States*, 374 F.2d 312 (D.C.Cir.1967) (relying on supervisory power to exclude evidence obtained in violation of ethical rule but *United States v. Lemonakis*, 485 F.2d 941, 955 n. 21 (D.C.Cir.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974), construed the violation in *Mathies* as one of "constitutional dimension"); *Ricks v. United States*, 334 F.2d 964 (D.C.Cir.1964) (same). *Cf. United States v. Thomas*, 474 F.2d 110 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *Coughlan v. United States*, 391 F.2d 371, 376 (9th Cir.) (dissent), *cert. denied*, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); *United States v. Wedra*, 343 F.Supp. 1182 (S.D.N.Y.1972). Other cases indicate that exclusion of evidence obtained in violation of the rule in the absence of a constitutional infringement is not warranted. *See, e.g., United States v. Henry, supra; Massiah v. United States, supra; United States v. Vasquez, supra; Stringer v. State*, 372 So.2d 378 (Ala.Crim.App.), *cert. denied*, 372 So.2d 384 (Ala.S.Ct.1979); *State v. Hall, Iowa*, 297 N.W.2d 80, 90, *cert. denied sub nom. Hall v. Iowa*, 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981); *People v. Green*, 405 Mich. 273, 274 N.W.2d 448 (1979); *State v. McConnell*, 529 S.W.2d 185 (Mo.App.Ct.1975) *Cf. United States v. Thomas*, 474 F.2d 110 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *Coughlan v. United States*, 391 F.2d 371, 376 (9th Cir.) (dissent), *cert. denied*, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); *United States v. Wedra*, 343 F.Supp. 1182 (S.D.N.Y.1972). *See also Obser v. Adelson*, 96 N.Y.S.2d 817 (Sup.Ct. New York County 1949) (civil case suppressing evidence procured in violation of court rule prohibiting communication with adverse party), *aff'd*, 276 App.Div. 999, 95 N.Y.S.2d 757 (1st Dep't 1950).

For example, in *United States v. Kenny*, 645 F.2d 1323 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981), defendant Kenny sought to exclude one of the "more dramatic" pieces of evidence, a tape recording made by a codefendant as a government informer of conversations between the two. The recording occurred prior to Kenny's indictment but after the government knew that he was represented by counsel. Predictably, the Sixth Amendment provided no basis for suppression. Also unsuccessful, however, was Kenny's ethical violation argument in view of the recording's factual setting, that is, "a non-custodial environment, prior to . . . charge, arrest or indictment." *Id.* at 1339. *Cf.* ABA Comm. on Professional Ethics, Opinions, No. 337 (1974) ("mere fact that secret recordation in a particular instance is not illegal will not necessarily render the conduct of a public law enforcement officer in making such a recording ethical," but in "extraordinary circumstances" government attorney might ethically make and use secret recordings if acting within statutory limits conforming to constitutional requirements). *See also* NYSBA Comm. on Professional Ethics, Opinions, No. 328 (1974) (even if electronic recording by private attorney is not illegal "it offends the traditional high standards of fairness and candor that should characterize the practice of law and is improper except in special situations").

In *Ricks v. United States*, 334 F.2d 964 (D.C.Cir.1964), the Court of Appeals for the District of Columbia reversed a conviction for the improper admission of pre-indictment statements made to the police by the unrepresented defendant after his arrest and prior to his unduly delayed preliminary hearing. The court refused to put the matter on the ground of constitutional mandate, relying instead on "the exercise of . . . local supervisory power." *Id.* at 971. *Cf. Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Never-

theless, in the subsequent case of *Lemonakis v. United States*, 485 F.2d 941 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974), it concluded that a surreptitious recording made in a noncustodial setting constituted no ethical breach. Drawing a Sixth Amendment distinction for ethical purposes between the investigatory and accusatory stages of criminal proceedings, the court found that the Code did not "embrace" communications between the government informer and the represented but unindicted suspect. *Id.* at 955–56. At the same time the court refused to extend the Sixth Amendment by redefining the "critical stage" at which the right to counsel attaches. It relied heavily on a Second Circuit case, *United States v. Massiah*, 307 F.2d 62 (2d Cir. 1962), *rev'd on other but related grounds*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), arriving at much the same result.

Cases failing to discern an ethical infraction, such as *Lemonakis* and *Kenny*, also fail to find a constitutional violation. Conversely, most cases finding an ethical violation have been those explicitly finding a simultaneous constitutional infringement. *Schantz v. Eyman*, 418 F.2d 11 (9th Cir. 1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1259, 25 L.Ed.2d 530 (1970); *Lee v. United States*, 322 F.2d 770 (5th Cir. 1963); *United States v. Wedra*, 343 F.Supp. 1183 (S.D.N.Y. 1972).

In only a few cases have federal courts suggested that an ethical violation occurred in the absence of a constitutional infraction. In *United States v. Four Star*, 428 F.2d 1406 (9th Cir.), *cert. denied*, 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253 (1970), for example, although the defendant voluntarily waived his *Miranda* rights the court cautioned that an in-custody interrogation of a represented accused in the absence of counsel violated professional ethics. The ethical violation was apparently not suggested as a ground for suppression. *United States v. Thomas*, 474 F.2d 110 (10th Cir.) *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973), likewise considered it to be an ethical violation to communicate with a represented accused in custody, after the filing of a criminal complaint and arraignment without consent of counsel regardless of whether the government agent knew the accused was represented. Some of the language in *Thomas* is very broad, suggesting that custody would not be a controlling factor. Because the issue was first raised on appeal, the court refused to reverse and set down a prospective prophylactic rule. The suggestion in *Thomas* is strong, however, that had the trial court suppressed, it would have been affirmed. Although nowhere does the *Thomas* court speak of constitutional rights, resting its decision instead on ethical considerations, subsequent cases have apparently viewed *Thomas* as establishing a principle of constitutional dimension. *See, e.g., People v. Pierson*, 633 P.2d 485, 488 (Colo.Ct.App.1981).

While the cases tenaciously link the scope of DR 7–104(A)(1) in criminal matters to that of the Sixth Amendment, this unity is neither apparent nor compelling. The two principles are not Siamese twins. The Constitution and the Code of Ethics stem from different sources, serve independent, although sometimes congruent, interests, and may require different means to effectuate their goals.

The Constitution, for all its grandeur, represents only the "minimal historic safeguards ... summarized as 'due process of law'." *McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). The Code embodies more. It articulates a lawyer's obligation "to maintain the highest standards of ethical conduct." ABA Code of Professional Responsibility Preamble. *See* ABA Comm. on Professional Ethics, Opinions, No. 203 (1940); NYSBA Comm. on Professional Ethics, Opinions, No. 328 (1974); NYSBA Comm. on Professional Ethics, Opinions, No. 272 (1972) (application of the Code is not necessarily affected by statutes or regulations prescribing less stringent standards); NYSBA Comm. on Professional Ethics, Opinions, No. 323 (1974) ("Professional standards adopted in the public interest often condemn the doing of what the law has not forbidden."). And in a number of contexts,

the Sixth Amendment and DR 7–104(A)(1) have been afforded disparate limits. For example, even before the Sixth Amendment right was held to attach at the early pretrial stages, for purposes of DR 7–104(A)(1) a defendant was deemed represented from the time he requested the assistance of counsel. 28 Ore.S.B.B. 10, Opinion No. 155 (1967). *See also Abeles v. State Bar*, 9 Cal.3d 603, 108 Cal.Rptr. 359, 363 & n.7, 510 P.2d 719 (1973) (rule applies to attorney of record regardless of whether he was authorized in fact to act for the party in the matter).

■ Present federal law apparently permits a defendant to waive his constitutional rights and to communicate with the authorities with or without the presence of his attorney so long as the waiver is an intelligent and voluntary one. *See Brewer v. Williams*, 430 U.S. 387, 405–06, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424 (1977); *United States v. Brown*, 569 F.2d 236 (5th Cir. 1978) (en banc); *United States v. Rodriguez-Gastelum*, 569 F.2d 482 (9th Cir.), *cert. denied*, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978). Such a waiver in the absence of counsel does not violate the defendant's constitutional rights.

■ The rule necessarily is otherwise with respect to DR 7–104(A)(1) because it is not directed solely at protecting the defendant's rights. The ethical rule is also intended to enhance an entire profession's ability to perform its essential functions effectively through the protective screen it places around the client and the attorney-client relationship. This relationship may arise at any time; its existence does not depend upon the stage of investigation or adversarial proceedings. Once it is established, the attorney has assumed the duty to zealously and competently represent the client and he may be held accountable for faithful performance. *See* ABA Canons of Professional Ethics Nos. 6, 7 and 9. To assign him such broad responsibilities implies that he will have some measure of control over developments concerning his client, whether in the nature of investigation, discovery, settlement or otherwise. No attorney can

insure that his client will not imprudently sign a release, for example, or divulge privileged information whether by reason of ignorance or susceptibility to undue pressure. The Code supplies the necessary restraint in order to make the attorney's duty tenable by controlling the conduct of the adversary's counsel. Thus, the communication prohibition remains operative even where a represented party requests or agrees to communicate in the absence of his own attorney with opposing counsel. ABA Comm. on Professional Ethics, Opinions, No. 108 (1934). Unlike Sixth Amendment rights, the Canon "is not something the defendant alone can waive." *United States v. Thomas*, 474 F.2d 110, 112 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973).

### F. *New York Rule.*

■ Whatever the rule may be in the federal cases discussed above, New York State courts would apply the New York State Bar Association Code DR 7–104(A)(1) —which is identical with the American Bar Association's version—to interviews before indictment of a represented person. *See People v. Skinner*, 52 N.Y.2d 24, 436 N.Y. S.2d 207, 417 N.E.2d 501 (1980); *People v. Hobson*, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976). *Cf. Tabbi v. Town of Tonawanda*, 111 Misc.2d 641, 444 N.Y. S.2d 560 (Sup.Ct. Erie County 1981) (civil case; exclusion of evidence is not proper remedy for a violation of DR 7–104(A)(1) absent infringement of constitutional rights).

The present United States Attorney and all of the judges of this court are admitted to practice in New York State's courts. They are subject to the State's disciplinary rules. An attorney disciplined by the state courts for an ethical violation is almost invariably treated in the same way when he has also been admitted in this court. *See* Local Rules United States ·District Court, Eastern District of New York, General Rule 5. For all practical purposes New York's ethical decisions are treated as binding when this court exercises control and super-

vision over those admitted to practice before us. It is hard to justify a practice whereby this court sanctions an action which would be unethical were it taken in a state court.

### III. *Supervisory Powers.*

 Federal courts have long been charged with the duty of overseeing the orderly administration of criminal justice and supervising the practice of attorneys before the federal bar including government attorneys and investigative officers. *See, e.g., McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Smith v. Katzenbach*, 351 F.2d 810 (D.C.Cir.1965). The exercise of supervisory power is not limited to enforcing the minimal standards of conduct and procedure derived from the Constitution but extends to establishing and maintaining those higher standards necessary and helpful in promoting fair adjudications and securing the integrity of the federal court system. *See, e.g., McNabb v. United States, supra*, 318 U.S. at 340, 63 S.Ct. at 613; *United States v. Payner*, 447 U.S. 727, 744–51, 100 S.Ct. 2439, 2450–52, 65 L.Ed.2d 468 (1980) (dissent) (collecting cases); *United States v. Massimo*, 432 F.2d 324, 327 (2d Cir. 1970) (dissent), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971). Thus, the court's inherent power may be applied to curb procedures with potential for abuse. *United States v. Tantalo*, 680 F.2d 903, 909 (2d Cir. 1982); *United States v. Hinton*, 543 F.2d 1002, 1010 (2d Cir. 1976), *cert. denied sub nom. Carter v. United States*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), *cert. denied sub nom. Bates v. United States*, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 783 (1977). *Cf. United States v. Thibadeau*, 671 F.2d 75, 77–78 (2d Cir. 1982). The supervisory power may be invoked "in any manner necessary to remedy abuses of a district court's process." *United States v. Toscanino*, 500 F.2d 267, 276 (2d Cir. 1974).

 Deception such as that practiced here on both the defendant and his attorney can be said to have constituted an abuse of the process of this court when the court becomes implicated—*i.e.*, when fruits of the deception are sought to be used in court. Introduction at trial of evidence obtained in this way would make the court an instrument of the ethical violation. To countenance a procedure such as is sought to be used here encourages contempt for the disciplinary rules. A court should not ignore the government's disregard of an established attorney-client relationship lest it invite a devaluation of the entire judicial process.

While the violation of DR 7–104(A)(1) has increasingly become an object of judicial concern, it has not been considered an adequate or appropriate basis for imposing supervisory sanctions such as exclusion *after* conviction. *Stringer v. State*, 372 So.2d 378 (Ala.Crim.App.), *cert. denied*, 372 So.2d 384 (Ala.S.Ct.1979); *State v. Hall*, Iowa, 297 N.W.2d 80, 90, *cert. denied sub nom. Hall v. Iowa*, 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981); *People v. Green*, 405 Mich. 273, 274 N.W.2d 448 (1979); *State v. McConnell*, 529 S.W.2d 185 (Mo.App.Ct. 1975). *Cf. United States v. Thomas*, 474 F.2d 110 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *Coughlan v. United States*, 391 F.2d 371 (9th Cir.), *cert. denied*, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); *United States v. Wedra*, 343 F.Supp. 1182 (S.D.N.Y.1972). *See United States v. Henry*, 447 U.S. 264, 275 n.14, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980); *Escobedo v. State*, 378 U.S. 478, 487 n.7, 84 S.Ct. 1758, 1763, 12 L.Ed.2d 977 (1964). *See generally* Broeder, *"Wong Sun v. United States*: A Study in Faith and Hope," 42 Neb.L.Rev. 483, 603 (1963) ("[T]he fault lies not principally with the prosecutors but with the courts who have repeatedly countenanced prosecutor abuse of Canon [7] by affirming convictions in which such abuses were present ...."). *See also Obser v. Adelson*, 96 N.Y.S.2d 817 (Sup.Ct. New York County 1949) (civil case suppressing evidence procured in violation of court rule prohibiting communication with adverse party), *aff'd*, 276 App.Div. 999, 95 N.Y.S.2d 757 (1st Dep't 1950). At that

stage enforcement of the ethical rule through retroactive suppression would usually entail reversal. In light of the high cost to society of such reversals there is understandable reluctance to use after-the-fact action as a mode of discipline. *See United States v. Morrison*, 449 U.S. 361, 365–66, 101 S.Ct. 665, 668–69, 66 L.Ed.2d 564 (1981) (dismissal of indictment); *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *Michigan v. DeFillippo*, 443 U.S. 31, 38 n.3, 99 S.Ct. 2627, 2633, 61 L.Ed.2d 343 (1979); *United States v. Ceccolini*, 435 U.S. 268, 274–80, 98 S.Ct. 1054, 1059–62, 55 L.Ed.2d 268 (1978); *United States v. Modica*, 663 F.2d 1173, 1184 (2d Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).

A trial court before trial has greater flexibility in fashioning appropriate remedies; the prosecutor may proceed but is merely restrained from acting unethically. *Cf. Massiah v. United States*, 377 U.S. 201, 207, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964) (continuation of investigation of suspected criminal activities "entirely proper," but improperly obtained statements may not be used by prosecutor as evidence against defendant at trial). Moreover, the task of ensuring that attorneys comport themselves in accordance with recognized ethical precepts is a task which "falls primarily upon district courts." *United States v. Modica*, 663 F.2d 1173, 1184 (2d Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). It can be performed without overturning a validly arrived at unanimous jury verdict. *Cf. United States v. Thibadeau*, 671 F.2d 75 (2d Cir. 1982). *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), does not require a trial court to refrain from exercising control over admission of evidence. *Payner* concluded that the supervisory power did not authorize suppression of unlawfully seized evidence "at the instance of a party who was not the victim of the challenged practices." *Id.* at 735 n.7, 100 S.Ct. at 2446.

■ Despite the strong reasons for invoking DR 7–104(A)(1) as the basis for exclusion, reluctantly the court must conclude that it would be inappropriate for a trial court in this circuit to do so at this time. The Second Circuit Court of Appeals has apparently recently denied that power to its trial judges. *See United States v. Vasquez*, 675 F.2d 16 (2d Cir. 1982). It wrote:

> Nor do we find merit in *Vasquez's* argument that, because he had at his own request been represented by counsel when he testified before the grand jury and prior to the time of the recording, Disciplinary Rule 7–104(A)(1) of the Code of Professional Responsibility was violated, entitling him to invoke the Sixth Amendment. Such a principle would simply enable criminal suspects, by retaining counsel, to hamper the government's conduct of legitimate investigations. Even assuming this provision of the Code to be applicable to a criminal investigation, which is doubtful, it was not intended to lead to such a result. Moreover, the district court found that at the time of the recording Vasquez was not represented by counsel, and we have been presented with no evidence suggesting that this finding was in any way erroneous.

*Id.* at 17.

While the *Vasquez* opinion is sparse in explication and might be distinguished as dictum since 1) the trial court found that the defendant was not represented by counsel when he was surreptitiously recorded, and 2) the decision may have been based on the Sixth Amendment rather than on the Disciplinary Rule, this recent statement appears to have been intended as binding Second Circuit procedural law. It was at first an unpublished opinion but was published at the request of the government, apparently as an advisory to trial judges and the bar. Reconsideration of *Vasquez* at least to limit its scope seems desirable.

## IV. *Redaction*

The court has unsuccessfully attempted redaction as a means of minimizing the

denigration of the attorney-client relationship which would be accomplished by use in court of the recording. Elimination of those portions in which defendant's attorney speaks tends, however, to give a more sinister 'cast to the conversation than it would have were the jury to hear the conversation without breaks and erasures.

If the recording is played without redaction, it will be almost impossible for counsel—clearly recognizable by his voice as the trial attorney—not to be compromised in conducting the defense. It may be possible for counsel to avoid taking the witness stand in violation of DR 5–102, but his voice sounding through the courtroom as the tape is played will make him a witness in fact. Any argument on behalf of his client will necessarily be a justification and explanation of his own conduct—a situation frowned on by our ethical standards.

## V. *Rule 403 of the Federal Rules of Evidence.*

The evidence of the recording can be justified under Rule 404(b) of the Federal Rules of Evidence grounds as showing the plan and practice of defendant in selling electronic equipment. But when used for this purpose, it is cumulative. There is no doubt that defendant was conducting a large and lucrative export business in electronic gear.

Those passages suggesting that defendant knew he needed export licenses would be admissible since specific intent appears to be an element of the crime. But they are at least ambiguous in their import. Considering that the statements were made after defendant's merchandise was seized by Customs for failure to have licenses, they can be construed as an explanation to a customer of reasons for the delay in delivery and of the need for the customer to provide information about such matters as ultimate destinations in order to obtain an export license. The risk that the jury will misconstrue the conversation is substantial, particularly since use of a recording device reflected an intense interest of law enforcement officials in defendant.

The slight probative force of the recording, its cumulative nature, the time required to deal with it in court, and its probable interjection of prejudice argue for exclusion under Rule 403 of the Federal Rules of Evidence. Difficulties in redaction, inhibition of trial counsel, and strong ethical doubts about the propriety of allowing the recording in evidence, even if not sufficient in themselves to warrant exclusion, support the Rule 403 result.

### Conclusion

Defendant's motion to dismiss is denied. The evidence of the recording may not be used in the government's direct case. Whether it may be used on cross-examination or on rebuttal depends upon developments at the trial not now predictable.

So ordered.